Our last case for argument this morning is 25-004, United States v. Woodard. Mr. Regal, if you could turn your camera and microphone on, please. Let's hope he's out there. I'm here, Your Honor. We're just having a small technical difficulty. All right. I think we're ready. We're ready to hear from the appellant. Thank you, Your Honor, and may it please the court, counsel. My name is Shira Keevel. I'm an assistant federal public defender in Denver, and I represent the appellant in this case, Evan Woodard. The impoundment of Mr. Woodard's car was unconstitutional under each prong of United States v. Sanders. The first prong of Sanders states that an impoundment is only reasonable if it's done in accordance with standardized criteria. Here, Tulsa's standardized criteria only allow impoundment of a car that's in a private lot, where the offense the vehicle was initially stopped for occurred on a public way. And additionally, the vehicle must be left unattended in a location rendering it highly susceptible to damage or vandalism. Both conditions are required, and neither condition was met in this case. The district court recognized that Mr. Woodard was not stopped for an offense that occurred on a public way. That is to say, the court recognized that the plain language of the Tulsa procedure did not allow for impoundment in this case. It erred when it then determined that the Tulsa policy and procedures are not limited to the plain language of the Tulsa policy and procedure. Moreover, while officers did testify that the entirety of North Tulsa is a neighborhood with a lot of car-related crime, there was simply no evidence that Mr. Woodard's car, which was parked and locked in the morning in daylight hours, in a marked space in front of a well-trafficked and well-maintained mini-mart, that that was highly susceptible to damage or vandalism. It was clearly erroneous for the court to find otherwise. So, neither of the requirements of the standard procedure was met, and additionally, the second requirement of Sanders was not met either, because all of the available evidence suggests that the search here was a search for evidence of a crime. Almost everything the officers said and everything that they did, and as the Supreme Court explained in Wren, the community caretaking impoundment is a unique doctrine where an officer's motive invalidates objectively justifiable behavior under the Fourth Amendment. So, what were the officers' motives here? Well, as the first officer to go search the car said, we're going to friggin' light him up with everything we can. The second officer who went to join him and conducted the search with him said, yeah, there's stuff in here, and turned around and walked towards the car. That first officer immediately began to search the center console of the car, the place that he said contemporaneously that he just saw Mr. Woodard messing around in when he was going to pull over. The other officer walked over, looked briefly in the front driver's side door, and then took out his flashlight to look under the driver's seat. Moreover, the first officer gave a pretextual explanation for what he was doing at the time of the search. That officer kept saying over and over, I'm just looking for insurance. I'm just looking for insurance, paraphrasing. And then he didn't begin where you would expect someone to look for insurance in the glove compartment. He looked in that center console again where he says he saw Mr. Woodard moving things around. Then when he finally did find an insurance card that was expired, he did nothing to check to see whether that policy was still in effect. There's no evidence anywhere on the record that any of the officers ever actually checked in the state database or with Mr. Woodard or in Mr. Woodard's wallet or with the owner of the car to find out if it was in fact insured. So that tells us two things. One, it's evidence of pretext. The officer said he was doing something, didn't actually do it, and then it turns out that that's not something that would be constitutional anyway. You can't just go look inside of a car to find evidence of insurance to see whether the driver was or was not complying with the state's insurance law. It also shows us that the district court's finding that there was no insurance on the car was clearly erroneous because there was no testimony from a single officer or anyone else at the hearing that there was no insurance on the car. And the evidence that was before the court, what was on this video, simply shows that the officer in the search that he did happened not to find a current insurance policy in the car. At that point, aren't you going a little bit too far to say it was clearly erroneous that he lacked valid insurance? Because we do have, you're right, the farmer's card was through 2015. It wasn't current and there was no inquiry. But we do have to view the evidence in the light most favorable to the government. We're constrained by the clear error standard. So wouldn't we be hard-pressed to say, if we view the evidence favorably to the government, that it was clearly erroneous to conclude that he lacked current insurance? Your Honor, I think that it would have been okay to say that he lacked, in his car, proof of current insurance. But I do think that it's clearly erroneous. We even know from the trial record in this case that Mr. Woodard's car was insured six months earlier when he was stopped in Bartlesville. I think that the issue, you can view, obviously you're required to view the evidence in the light most favorable to the court's determination there. But you can't stretch it past the weight of the evidence. And that's stretching it past the weight of the evidence. But I think it's also not critical to any of the arguments that I'm making here. I think it's important to note that the Tulsa policy and procedure tells officers to exercise discretion about towing, even if there's no insurance. So the district court's statement that there was no alternative to towing, even the Tulsa Police Department doesn't think that's true. And it isn't true. There's lots of alternatives. You can leave the car where it is, allow if the station would like to do a private tow, they can do it. You can offer to the person you've arrested to do a private tow. Those things are not going to require insurance. And they're going to be in the interest of the defendant, who then would only have to pay for the tow and not pay for the storage fees of his car. If you're thinking about poor people whose cars might be towed in North Tulsa, it's extremely important for them to be able to access their cars so that they can go to work. And so that being arrested for failure to pay fines and fees, which is what happened here, is not something that's going to lead them to then lose their job and have their life fall apart. Justice Sonia Sotomayor actually discussed this in a concurrence issued last week in a bankruptcy case about Chicago's impoundment policy. So it's not it doesn't mean that the police had no other alternative. So that finding on one of the Sanders factors, and I think that that's the most powerful finding that the district court made of, well, what else could they have done? It isn't supported by the evidence. It's not supported by the practical realities of what it is that you can do when you have a car parked and locked in daylight hours in a very well monitored parking lot. So your point is they should just have left the car there. I think that they absolutely could have left the car there. And I think under the Tulsa policies and procedures, and under this court's law in Sanders, they were required to leave the car there. We have some evidence here that the in the world of quick quick marks, they do not want vehicles left in front of their stores. We have some testimony about that at the hearing. Yes, Your Honor, I think. I'm sorry to interrupt. I think that that's a red herring. The question here, again, is the US Supreme Court has said in rent is very unique to this particular situation when we care about the subjective intent of the police officers, and whether they had a reasonable non pretextual community caretaking rationale. They didn't ask the owners. They didn't ask the employees what it is that they would have wanted, and they provided no testimony whatsoever about either knowing, believing, or even guessing what it is that the property owners would have wanted, or frankly, even caring. The testimony that was provided by the owner of quick mark was that they want the cars moved because particularly if they're parked next to the store because they want other customers to be able to access that store. But the non pretextual reason that the district court mistakenly erroneously found didn't have anything to do with the interests of quick mark, or the desires of quick mark, it had to do with this idea that these cars were highly susceptible to damage or vandalism. And again, I'd like to point out what the testimony from the officer was. And the testimony from the officer wasn't a concern for Mr. Woodard's car, it was a concern for the liability of the Tulsa Police Department. And we know that the Tulsa Police Department did not have liability, if they had left the car park where it was. This officer only incurred liability for the Tulsa Police Department by towing it. But if we're looking at from this, I mean, you're, you're, you're a lawyer, you're, you're, you're trained in the law, and Officer Douglas wasn't trained in the law. And so if we are talking, as you pointed out, with at least a prompt to have Sanders with regard to subjective intent isn't isn't isn't your argument, giving a little bit requiring a little bit too much of the officers to assume that that they are trained in the nuances of Oklahoma tort law. Your Honor, I don't think so. It's requiring that officers don't make things up. The officer here made something up. But moreover, in general, in the Fourth Amendment context, even in criminal investigations, where we're looking to see if the actions of a police officer are reasonable. Even there, we require that mistakes of law be reasonable mistakes of law. And for a mistake of law to be reasonable, it must be an ambiguous law. And it must, the officer must have a reasonable interpretation of a difficult question. And that's from this court's case in U.S. v. Romero. Well, well, I think I think it's pretty difficult for any of us to define even yet today. What is a rational care community caretaking? What what what does that encompass? I think that's a good question, Your Honor. And I think you can really think about it by looking at the core of the exception and where it comes from. And the core of the exception is when you have an accident on the freeway, when you have a drunk driver whose car is in the middle of the road, where you have something that's blocking the intersection, it's blocking traffic that is potentially a danger to the community. And here, the district court well recognized that neither of those existed. And this court has recognized in Sanders that that is the core of the community caretaking function and that the public way is the core locus where the community caretaking function takes place. And so Sanders focuses on what do you need when you don't have those things? And it absolutely requires the standardized criteria and the non-protectional community caretaking rationale. I guess that doesn't say what it that gives a couple of examples of what it is. Sanders also tells you what it's not. So Sanders does recognize that there's one case floating around in the 10th Circuit that says, here's this car that's been abandoned. We don't even know the name of the guy who was driving it. We're taking him away. And this car is like here forever. And therefore, it's susceptible to damage and vandalism and it can be towed. And Sanders essentially limits that case to its facts and says, you know, this whole thing about high crime area, we know that that's a signal of pretext. And so for that to really come into place, we need a car that's been abandoned. And here the government didn't argue abandonment below. There was no finding of abandonment. And I don't think there could have been because this was Mr. Woodard's car. He asked if he could call to have someone come pick it up. And there's all indications that that was his intention was to keep that car and he was being arrested on a warrant for failure to pay fines and fees. So there was also indication that he would be able to get out or even though the officers didn't allow him to call anyone that when he got back to the station, he would be able to make a phone call to arrange for something to happen for that car. Judge Briscoe does that answer your question. Yes. My next one is what do we do with the Bartlesville counts. And your honor, I think that those must be reversed as well. The government was required to show harmlessness beyond a reasonable doubt. I don't believe it even made that argument and it certainly didn't show harmlessness beyond a reasonable doubt. We have a situation where the government was trying to prove possession with intent to traffic drugs based on the amount of drugs based on scales but without any actual transactions. And one of the ways they did that was through text messages discovered in Mr. Woodard's phone after the phone was seized in Tulsa based on a search warrant that was based on the items found in the car in Tulsa. So they should not have been allowed to use that. They also provided testimony about drug dealers carrying guns. And that again, the only gun that was located was located in Tulsa. That evidence wouldn't have been allowed. And Mr. Woodard himself testified said, you know, if I'm a drug dealer, I'm sure a broke drug dealer. He denied that he was dealing these drugs and the officers did acknowledge at least one of the officers that it would be possible for someone who was only a user to have this quantity of drugs, although obviously he thought that it would be an unusual circumstance. And in that situation, I don't believe that that is proof beyond a reasonable doubt that this was harmless. Thank you. Thank you. I reserve 10 seconds, please. Ready to hear from the government. Thank you, Your Honor. May it please the court. My name is Victor Regal and I'm representing the United States. This court should affirm the district court's denial of Mr. Woodard's motion to suppress because consistent with this court's precedent in U.S. v. Sanders, the TPD officers who arranged for the impound of Mr. Woodard's car were in fact guided by standardized criteria in the form of the TPD regulation 31-112-G. Well, it's true that there is a procedure in place, but did they follow it? Yes, Your Honor, they did. They followed 31-112-G-1B as reasonably interpreted under the circumstances. Well, that's a lot of frosting on the words. Let's look at the words. The offense that was the basis for the stop did not occur on the highway, right? They were stopping him on a warrant. It is true, Your Honor, that the police were stopping Mr. Woodard on the basis of an outstanding warrant, apparently for failure to pay the costs associated with his public intox case. So how does that fit within the procedure? It fits within the procedure, Your Honor, when you read 31-112-G in its entirety and you see what function that specific provision is playing within the document as a whole. And what it's doing there is in a way providing a response to this court's concerns in Sanders. We know it's not a direct response because this same provision was present as far back as 2003. But in Sanders, the court held that a search or an impound cannot be constitutional in the absence of absolutely any authority standardized criteria authorizing it. Whereas here, we have this TPD regulation that's attempting to give the police just such authority in situations like this so as to fill that gap that the court identified in Sanders. So ordinarily, the jurisdictional hook for police officers here in TPD would be the use of a public way, as you can see in 31-112-G. But that carve out there in 1B is intended, you know, in the context of this document, to provide the police a practical way to remove cars that are otherwise going to be sitting unattended in areas where they can be damaged. So when it says in part of 1B, this includes private property open to the public when the offense of the vehicle is initially stopped for, I mean, offense itself is not a defined term within this regulation, which necessarily leaves it up to a certain degree. What was the offense he was stopped for? Well, that depends how you look at it. I mean, the reason the police had top of mind was that he had an outstanding warrant. Now, a reasonable police officer might have, you know, being familiar with this document, it's true under the circumstances that an outstanding arrest warrant is an offense for these purposes. But the offense that gave rise to that warrant evidently was a failure to pay costs. Did any of that, the failure to pay costs or the outstanding warrant or any of that, did any of that occur on a public way as defined, but in the procedure? Well, failure to pay costs is not a geographically limited offense. So wherever you are, you're okay. You think it would fall within this procedure. If you haven't paid costs, they can tow your vehicle if it's parked on private land. Yes, Your Honor. He was, Mr. Woodard was committing that offense everywhere at the same time, both on and off public ways. Has this procedure ever been interpreted in that way? The only precedent that the government could find interpreting 31112G was this court's decision in U.S. v. Walker from 2003, where that issue was not before the court because the basis for the stop in Walker was the police having witnessed an unsafe lane change. So I'm aware of no precedent at all, one way or the other on this point. Can I ask you a follow up on Judge Briscoe's question? Hypothetically, let's say I owe $5 on an outstanding parking ticket. And the Oklahoma City Police Department, for whatever reason, curiosity, they think that I'm a drug dealer or some other very serious criminal. Can they surreptitiously wait outside my house until I until I go until I pull out on the street, pull me over and then say, you know, well, I don't live in Tulsa, but hypothetically, let's say Oklahoma City adopts the same policy. Would they be able to stop me pursuant to this impoundment policy just as they had stopped the defendant in this case? I'm not sure in your honor's hypothetical if you specified whether there was an outstanding warrant or not. OK, sorry. There is an outstanding warrant because I owe five dollars. Well, the information available to the police, I do not believe certainly nothing in the evidence in this case suggests they are aware of what the amount would be for failure to pay costs. I think what the police would be able to see is that there was an outstanding warrant. But your point, but your point, I guess, if if I could put words in your mouth, is that if there's an arrest warrant, it doesn't matter whether it's for first degree murder or an arrest warrant for failure to pay a five dollar fine. If there is an arrest warrant, the answer is yes, they can wait outside anybody's home. And as soon as you pull out into a public street, whether it's a neighborhood street or not, they can pull you over pursuant to this policy. Is that is that is that right? Well, I don't know that it would even be this policy necessarily that would justify the stop as much as it would just be the warrant itself. As far as thirty one one twelve G extends the offense and the public way is only really functioning as the jurisdictional hook here. What's really happening, the police discretion or all the other requirements, which here include whether the vehicle is abandoned or the driver was arrested, whether it's going to be left unattended or it won't. If it's a traffic hazard or it's not, if it's highly susceptible to damage or vandalism or it's not. So I think in order to answer the court's hypothetical, there would be more information necessary to, I guess, intelligently respond to what the police would be able to do under those specific circumstances. But as far as being able to stop you pursuant to the warrant, you spoke, I really meant stop me and then impound my car right outside my house because it's on the street. It's on a public, if it's on a public way, then yes. I mean, assuming that there's a reasonable basis to believe that that's going to constitute a traffic hazard, which presumably it would. You've cited us to one G in the policy. Is that right? In the procedure? No, Your Honor, the overall policy that the government is discussing here is thirty one one twelve G and the specific provision is one B. Okay. Okay. I thought you were citing yet a different provision aside from one B. So one B is our only focus, right? Yes, Your Honor. I apologize for the confusion. Is there any evidence in this case of pretext by the officers for their search? No, Your Honor, there is not. And the point the government would like to make here is that what standard. What do we do with the comment? We're really going to light him up. Well, the comment we're really going to light him up could be less aggressively rephrased as let's let's write him up for all the crimes we see he's committed, in which case, you know, it becomes much less controversial. So when Officer Douglas says at the outset, before they've done anything, I want to light him up with whatever with what a friggin light him up with whatever we can. What he's really meaning is because all he knows is there's an outstanding protective order that's never been served. So what you're saying is that could possibly be that we we just really want to cite him for tickets if he's done something bad. We don't know of anything that he's done bad other than there's an outstanding warrant. But I just I don't want but I want to say if he's speeding, I want to spite him. We can really infer that from the evidentiary record. And where? Well, Your Honor, may I respond? Please. Yeah. As I recall, the immediate context surrounding that comment was when Officer Douglas was describing to one of the other officers on scene what was happening. I believe it was Ryan Rogers who had just arrived on scene to assist, but he was letting him know what had happened so far. And he said, no DL, meaning Mr. Woodard was driving without a driver's license. I believe there was the warrant issues like no DL, warrant for public intox. We're going to light him up for whatever we can. So I think the surrounding context there helps to explain a little bit what that means. And then they start searching. So aren't they then pursuing a criminal investigation to find evidence to light him up, which means we all know what it means to charge him with whatever we can possibly find? No, Your Honor, I don't think that's the reasonable interpretation under the circumstances here. And to just put this in the context of the case law, what Sanders referred to as pretext essentially dates back to 1987 with Colorado v. Bertine and Colorado v. Bertine's concern with whether police are acting solely for the purpose of investigation. You know, Florida v. Wells described that in a slightly different way by saying an inventory search cannot be a route for a general rummaging. And then Sanders in 2015 says the search can't be pretextual. But it's all getting at the same thing. You can't have police inventing a reason to search where there is none. Or I guess more directly, they can't be inventing a reason to impact where there is none. So when Officer Douglas immediately, his first place to look is in the center console and explains that he's looking there because he saw the defendant moving around there. And then also looks, his first two places, if I'm not mistaken, are the middle console and then under the driver's seat because he saw him fishing around there. So what is the explanation other than he's trying to find contraband? What does it matter whether he was fishing around in the console or under the seat? He's trying to find what's in the vehicle. Right. Under the circumstances, I don't think it does matter. I mean, why isn't that only evidence of pretext? The only explanation is he's trying to find contraband other than truly trying to inventory the contents of the car. Because there's no requirement that an inventory begin in any one specific place. And further to this point, I would just direct this court's attention to U.S.B. Sanchez from 2018, in which case you had a police officer who evidently at the suppression hearing had testified, yes, I was trying to find drugs. I walked a narcotics dog around the car and the narcotics dog did not alert. So I asked permission to search the car. I was denied that permission. And then I called the rental car company and the rental car company directed me to impound. And then I found the drugs. And this court acknowledged that that was OK under the circumstances. And there it's much less equivocal what the intent of the police were. The appellant here has put together a circumstantial case, arguing that the police really did want to find drugs or gun or some other kind of contraband. But even if the government were to concede that point and say, yes, they were looking for drugs or they were looking for a gun so long as they were, they had a valid basis to do the impound under 31.112G, consistent with Sanchez, that's still OK. So what does pretext mean under Sanders? So if you have if you have two motives, you have a 2 percent motive to because we have a policy and we mistakenly think we could be sued. So we're going to impound the vehicle and do an inventory search. But 98 percent is, you know, we want to we want to investigate for criminality this guy. So we can't we can't grant a motion, a pulled a motion to suppress the grant of a motion to suppress based on pretext. If there's a 1 percent motive, it's legitimate. Well, it's not the subjective motive of the officers here that controls. It's whether they, objectively speaking, had a valid basis to do the inventory in the first place. And it's similar to the logic underlying inevitable discovery. I mean, if I thought I thought in Ren, we were told that subjective motivation by the officer was key. Well, the subjective, the subjective motive of the officer may be key in the absence of any evident reason to do an inventory in the first place. But here are the police who are acting in their capacity as community caretakers, effectuating the removal of Mr. consistent with what common sense would tell an officer under those circumstances, namely that this car is going to be sitting there for an indeterminate length of time in a high crime area, which lower court found on the basis of uncontradicted testimony from the police officer at the suppression hearings. He concluded that it would, in fact, be highly susceptible to damage or vandalism. And in addition, Quick Trip doesn't want that car there. So there are multiple reasons why the officers do that. Right. Unless they know that none of the officers knew that. Correct. I wouldn't go so far as to say they didn't know that. What I would say is that they didn't testify that they knew that. And that's OK. To rephrase, there's no evidence that they do that. There's no direct evidence in the form of testimony that they had consulted about it. We have the testimony from Quick Trip's designated spokesperson that Quick Trip's desires with the about the removal of these vehicles had been communicated to law enforcement. And law enforcement, as you can see from their actions here, did exactly what Quick Trip said they would have wanted had they been consulted. So that by itself is a reasonable and non pretextual community caretaking rationale. And I see my time. I need to ask you about the Bartlesville counts. Yes, Your Honor. Do they stand or fall in the event this court finds that the inventory was unconstitutional? The remaining charges for possession within four convictions for possession with intent to distribute should stand. Because if the court takes a look at Officer Silver's testimony from trial, which can be found in Supplemental R.O.A. Volume two, starting on page 112, you can see that the officer testified that in the several hundred times he had encountered someone with scales, he had never once encountered someone who was strictly a personal user of those. And then on page 129 to 131, there was further examination of Officer Silver from the Bartlesville PD, who said that on the basis of the trainings he had received, the number of arrests that he had conducted, the number of people he had come into contact with, who had distributed and used contact with informants, discussions with other investigators, together with the packaging of the narcotics found in Mr. Waters car and the digital scales meant that to him it was possession with intent to distribute. And so you would have to establish and convince us that it's harmless beyond a reasonable doubt. If we reverse on the Tulsa charges, that there was no spillover to the Bartlesville charges. That's correct, Your Honor. And the way the court would do that would be to evaluate the other evidence supporting those charges. And the appellant has pointed out testimony about text messages, et cetera. But the court, as it articulated in USB Russian, is to consider the alleged error, quote, in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt. And the government, the government's position is that Officer Silver's expert opinion on what, on whether this constituted possession with intent to distribute could be dispositive on its own, even in the absence of all the other testimony. Thank you. Thank you. We have some rebuttal time. Keval, if you'd like to rebut. Just briefly, Your Honor. Right at the end of Mr. Regal's statement, the government statement, he again said could be dispositive. And his standard there is that he needs to show beyond a reasonable doubt that this was harmless. Thank you. Thank you both for your arguments this morning. The case is submitted.